UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| GARRY WESTERN, | |
| Plaintiff, | Case No. 2:16-cv-00010 |
| v. | Judge Trauger |
| | Magistrate Judge Newbern |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] Defendant. | |

To the Honorable Aleta A. Trauger, District Judge

## <u>REPORT AND RECOMMENDATION</u>

Pending before the court in this Social Security action is Plaintiff Garry Western's Motion for Judgment on the Administrative Record (Doc. No. 20), to which the Government has responded (Doc. No. 22). Western has filed a reply. (Doc. No. 27.) Upon consideration of these filings and the transcript of the administrative record (Doc. No. 6),[2] and for the reasons given below, the undersigned Magistrate Judge RECOMMENDS that Western's motion for judgment be GRANTED, the decision of the Commissioner be REVERSED, and the cause be REMANDED for further administrative proceedings consistent with this opinion.

---

[1]     Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017, replacing Carolyn W. Colvin in that role. Berryhill is therefore appropriately substituted for Colvin as the defendant in this action, pursuant to Federal Rule of Civil Procedure 25(d) and 42 U.S.C. § 405(g).

[2]     Referenced hereinafter by the abbreviation "Tr."

## I.     Introduction

Garry Western filed an application for disability insurance benefits (DIB) under Title II of the Social Security Act on February 22, 2010, alleging disability onset as of December 19, 2008, due to a back injury, spinal stenosis, sciatica, and lower leg and back pain. (Tr. 108, 155, 159.) His claim was denied at the initial and reconsideration stages of review by Tennessee Disability Determination Services (DDS). Western requested de novo review of this claim by an Administrative Law Judge (ALJ). The ALJ hearing was held on August 16, 2011, and Western appeared with counsel and gave testimony. (Tr. 25–49.) Western's wife also testified. The ALJ issued a decision in which he found Western not disabled. (Tr. 749–57.) The Appeals Council denied Western's request for review of that decision (Tr. 762–64.) Western subsequently appealed to this court for review of the ALJ's decision. *Western v. Social Security Administration*, Case No. 2:12-cv-00025 (M.D. Tenn. 2012). After filing its answer and a transcript of the administrative record, the Government moved for reversal and remand of the agency decision, which was granted without opposition on September 7, 2012.[3] (Tr. 769.)

On remand, the case was heard by a different ALJ. That hearing was held on August 15, 2013, and Western again appeared with counsel and testified. (Tr. 661–717.) Western's wife testified, as did a vocational expert. A supplemental hearing was held on April 7, 2014, in which Western's treating psychiatrist and a second vocational expert testified. (Tr. 630–60.) At the conclusion of the supplemental hearing, the ALJ took the matter under advisement until October

---

[3]     The Government argued only that "[r]emand is appropriate in this case for further administrative proceeding including updating and reevaluating the record and securing vocational expert testimony, if needed." Docket Entry 12, Memorandum in Support of Motion for Entry of Judgment Under Sentence Four of 42 U.S.C. § 405(g) with Remand to Defendant, Case No. 2:12-00025 (M.D. Tenn., Sept. 4, 2012).

2, 2014, when she issued a written decision finding Western not disabled. (Tr. 604–17.) That

decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since December 19, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: obesity, depression, anxiety, bipolar disorder, alcohol dependence in reported remission, degenerative disc disease in the lumbar spine status post herniated disc at L5-S1 and surgery, coronary artery disease status post unsuccessful attempt to open chronically occluded LAD and RCA (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except standing and/or walking up to 4 hours in an 8-hour day 30-minutes at a time; sitting for up to 8 hours in a day; avoiding hazards, heights, exposure to pulmonary irritants, crawling, and kneeling; avoiding climbing ladders, ropes, and scaffolds; occasionally climbing ramps and stairs; occasionally balancing, stooping, and crouching; occasionally reaching overhead; understanding, remembering, and carrying out simple and detailed but not complex instructions.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on March 11, 1978 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 19, 2008, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 606–07, 609–10, 615–17.)

On December 8, 2015, the Appeals Council denied Western's request for review of the ALJ's decision (Tr. 585–88), rendering that decision final. This civil action seeking review was timely filed on February 8, 2016. 42 U.S.C. § 405(g).

## II. Review of the Record

### A. Medical Evidence

Western was born on March 11, 1978. (Tr. 108.) He dropped out of high school, but got his GED and attended "about three years of college" to become certified as a paramedic. (Tr. 28, 1946.) He was several years into his career as a paramedic when, on November 9, 2005, he experienced "the acute onset of back pain while lifting a patient on the job." (Tr. 2257.) A lumbar MRI performed on November 15, 2005, showed a "left paracentral disc protrusion L5-S1." (Tr. 333.) He was treated by neurosurgeon Joseph Jestus, M.D., from December 2, 2005, to April 25, 2006, for what Dr. Jestus diagnosed as a lumbar sprain or strain. (Tr. 2257–2272.) On Dr. Jestus's referral, Western participated in physical therapy at Cookeville Therapy Center from December 6, 2005, to April 17, 2006. (Tr. 2215–2251.)

Western re-injured his lower back while working as a paramedic on December 19, 2008, the alleged onset date of disability, and was treated at the Smith County Memorial Hospital. (Tr. 230–36.) On January 13, 2009, he was evaluated by Dr. Roy Terry, M.D. (Tr. 270.) Dr. Terry noted the cause of injury as "Mr. Western . . . lifting a 325 to 350 pound patient in the line of his employment at Smith County Ambulance Service." (*Id.*) Western reported that he had previously suffered a low back injury in 2005 lifting patients and was told at that time he had a bulging disc.

(*Id.*) In 2005, "he rested for eight to nine months before going back to regular work." (*Id.*) He had "had complaints since that time and has been present off and on with his back." (*Id.*) The physical exam findings were negative ("negative straight leg raise," "no pain or range of motion of the hip bilaterally," no motion or strength deficits, etc.) but Western did "have pain, however, down the left side in a pattern consistent with an L5 or S1 area." (*Id.*) Dr. Terry prescribed Skelaxin, Celebrex, and Lortab and referred Western to physical therapy. (*Id.*)

A lumbar MRI performed on February 17, 2009, by referral of Dr. Terry showed the following:

> Impression: L3-S1 multilevel spondylosis including disc protrusions at each of these levels. Findings are greatest at L5-S1 where there is mild to moderate left posterolateral probable disc protrusion with mild left lateral recess and left foraminal stenosis and slightly left S1 nerve impingement.

(Tr. 272–73.) On March 10, 2009, Western received a lumbar epidural steroid injection ordered by Dr. Terry. (Tr. 271.) On March 31, 2009, Dr. Terry reviewed the February MRI and wrote that it "does show evidence of a subligamentous disc herniation per my opinion, and it does show per the prior report that was done in 2005 . . . the gentleman did have a left paracentral disc protrusion at L5-S1." (Tr. 266.)

On May 22, 2009, Western began treatment with Gray Stahlman, M.D. (Tr. 346.) Dr. Stahlman described Western as "a healthy, although heavy-set gentleman in no acute Distress" who was "6 feet and 2 inches tall, and 268 pounds." (*Id.*) Dr. Stahlman's examination findings were mostly negative ("no muscular spasm," "no motor, sensory, or reflex deficits in his lower extremities bilaterally," "hips have full range of motion bilaterally," "negative straight leg raise test on the right," "good pedal pulses," "normal gait"); the positive exam findings were limited to "slight decreased lumbar lordosis," some slowness in forward flexion from the waist, and a "positive straight leg raise test on the left with left posterior buttock and thigh pain some back

pain." (*Id.*) Dr. Stahlman reviewed the February lumbar MRI and, like Dr. Terry, noted that it showed a herniated lumbar disc ("He has a disc herniation at L5-S1 on the left, which is extruded."). (*Id.*) In formulating his recommendations, Dr. Stahlman noted that, "[w]hile he does have radiographic evidence of degenerative change, he has been asymptomatic" and he "presents a difficult challenge because of the predominance of axial back pain." (*Id.*) Noting that "lumbar fusion in a gentleman so young is fraught with potential downsides," Dr. Stahlman recommended lumbar discectomy at L5-S1 on the left "to attempt to alleviate his radicular symptoms and help to reduce his back pain symptoms." (*Id.*) The discectomy surgery was performed on July 6, 2009, and Dr. Stahlman's operative report confirms the identification and removal of the "disc herniation." (Tr. 349–50.) Dr. Stahlman further noted that "[t]he disc space was considered degenerative and narrowed," "loose fragments" were removed from the disc space, and a "calcified disc annulus was also excised." (*Id.*)

A subsequent trial of a work hardening program, intended to help Western return to his job, caused Western's back pain to recur and brought on persistent left lower extremity radicular pain. (Tr. 341.) Dr. Stahlman ordered a repeat MRI and an epidural steroid injection, which failed to relieve Western's symptoms. (Tr. 327, 338–40, 351.) On December 18, 2009, Dr. Stahlman noted his agreement that Western "could not return safely into the EMS environment"; recommended that Western continue pain management; counseled Western not to pursue "surgical fusion for his progressive disc degenerative changes at the surgical level" at this time; and released him "with a permanent lifting restriction of no more than 30 pounds." (Tr. 338.)

On February 25, 2010, Western began receiving pain management treatment at the office of Jeffrey Hazlewood, M.D. (Tr. 531–33.) Dr. Hazlewood's initial impressions were:

1.  Chronic low back pain and left lower extremity referred pain with a disc herniation at L5-S1. He presents primarily with lumbar axial pain status post

L5-S1 diskectomy. He does have some referral down the left lower extremity to the mid calf in a S1 distribution probably, and does have evidence on examination of a previous S1 radiculopathy.

2.  The repeat MRI after surgery showed some scar tissue and mild bulge off to the left, but again he presents now with primarily mechanical back pain. Overall 40% improved with surgery.

3.  S1 joint pain probably referred from the lumbar spine.

4.  Does seem to present with very legitimate pain, and did have a full and consistent effort on FCE.

5.  Obesity.

6.  Opioid dependency in the past, but off of these now. I think his risk for addiction is low.

(Tr. 532.) Dr. Hazlewood ordered a trial of Neurontin and a transcutaneous electrical nerve stimulation (TENS) unit, and he injected the left SI joint region with a total of 40 mg Methylprednisolone/3cc of 0.25% Marcaine/3cc of 1% Lidocaine. (Tr. 533.) Lortab was added to Western's medication regime soon thereafter, and that medicine in combination with the Neurontin greatly helped Western's pain (Tr. 528) until July 2010, when Western reported:

Having some lock up pain lately causing him to fall, and he landed in a split position. He has had increased pain since, and this has been present for about two weeks. He has pain in the low back referring down both lower extremities, right greater than left. He gets tingling in his right posterior thigh with no numbness . . . He describes the pain as a pressure in his low back and buttocks region. He fell yesterday morning in the kitchen because his 'back locked up'. Average pain is 5/10 with the medication and 9/10 without it. He feels weak in both legs. Pain is worse with prolonged positions and bending.

(Tr. 526–27.)

On August 3, 2010 Western returned to Dr. Stahlman's office "rather unexpectedly" reporting a "marked increase in his lower back pain after a fall in the yard about a month ago. . . ." (Tr. 1818.) Western said that he was "really having a bad problem. It is predominantly axial pain." (*Id.*) Dr. Stahlman had x-rays taken of Western's lumbar spine which showed "disc degenerative

changes at L5-S1." (*Id.*) Dr. Stahlman also ordered a lumbar MRI, which was performed that same day and read as follows:

1.  New focal central annular scarring seen and associated with a stable 1-2 mm posterocentral disc protrusion at L3-4. No spinal stenosis results.

2.  Mildly enlarging focal central 3 mm disc protrusion at L4-5. The central canal remains patent.

3.  Left laminotomy and discectomy changes at L5-S1 as before. There is persistent enhancing granulation tissue encasing the traversing left S1 nerve root within its lateral recess. Asymmetric endplate spurring to the left combine with facet arthropathy as before to produce stable mild left L5 foraminal stenosis.

(Tr. 1821.) Western saw Dr. Stahlman in follow-up to the MRI on August 17, 2010. (Tr. 1820.) Dr. Stahlman wrote that the lumbar MRI "shows no evidence of recurrent disc herniation at L5-S1. He has advancing disc degenerative changes at L5-S1 and L4-5." (*Id.*) He discussed the situation with Western "at length" and advised that, "unless he can no longer live with his back symptoms, he should continue with nonsurgical care. Surgical treatment would include an evaluation with discogram to determine if he does have discogenic pain, and the (sic) consider fusion at L4-5 and L5-S1. Obviously, this has its own set of downsides. . . ." (*Id.*)

Two days later Western followed up with Dr. Hazlewood, who, after hearing Western's report of pain at a 7 on a 10-point scale, decided that it was "time to go ahead and change him to [the] sustained release opioid medication" Embeda (a morphine-based pill), with Lortab (Norco) reduced to one to two tablets per day for breakthrough pain. (Tr. 523.) Control of Western's pain with this combination of pills was "definitely . . . better" with no side effects, reducing his pain "literally down to a 0-1/10" and enabling him to be more active and sleep better at night. (Tr. 522.) His pain remained under good control despite some fluctuation until June 2012, when he was weaned off the narcotics and suffered an increase in pain as a result. (Tr. 1891–92.) His pain

stabilized without the narcotics, however, and was back to 1/10 in September 2012 with the use of Robaxin, Neurontin, and a TENS unit. (Tr. 2276.)

Western's report to Dr. Hazlewood in January 2013 was much the same as it was on in September 2012. (Tr. 2275.) However, when he returned five months later on June 25, 2013 (after being psychiatrically hospitalized in mid-January and suffering a heart attack less than two weeks later) he rated his average pain with medication as an 8/10 in intensity and noted "increased pain since last office visit":

> He states 50% back pain, 50% lower extremity pain. He states it is the same kind of pain in the past and is occurring more often. He denies any new injury, falls or change in activity. He states he mainly has right lower extremity pain, but occasionally to both legs. He states it radiates down the posterior right lower extremity to the calf and occasionally to the left side as well. He states he uses his TENS unit constantly, works while it is in use. Then once he takes it off, his pain returns.

(Tr. 2747–48.) Western noted that he had "been on a higher dose in the past of Neurontin and thought it was causing memory changes, but now he feels it was related to his depression" and that he was under the care of a psychiatrist. (*Id.*) His Neurontin was increased to 300 mg three times daily and he was advised to take a TENS unit "holiday" in hopes that this would "reset his body." (*Id.*)

Western's next visit with Dr. Hazlewood was in December 2013, at which time he reported that "overall his pain has been about the same since the last visit. He has had a couple of flare-ups lasting a few days since last seen. He is using a TENS unit which helps some. He is not working, but remains active." (Tr. 2813.) Dr. Hazlewood continued the Neurontin and Robaxin (*Id.*) The last treatment note from Dr. Hazlewood is dated May 22, 2014. (Tr. 2812.) At that time Western rated his average pain a 6/10 in intensity with medication and 8-9/10 without medication, and reported that "overall he's had no change in his low back pain." (*Id.*) He did complain of neck pain

for the preceding 3 months. (*Id.*) Dr. Hazlewood continued the prescriptions for Neurontin and Robaxin. (*Id.*)

After earlier reports to his pain management providers about depression and anxiety (Tr. 1862–63, 2104–05), Western began formal psychiatric treatment for depression and anxiety in July 2012 with Centerstone Community Mental Health Center. (Tr. 1925–30.) He was diagnosed with and treated for recurrent moderate major depressive disorder, panic disorder with agoraphobia, and alcohol abuse. (Tr. 1948.) The symptoms of these disorders were reduced with prescribed medications, as Western reported at follow up appointments later in 2012. (Tr. 1934, 2005, 2007.)

On July 2, 2012, and by referral of DDS, Western was consultatively evaluated by Linda Blazina, Ph.D. (Tr. 1895–99.) There is no indication that Dr. Blazina was provided with any background medical information. (*Id.*) Her evaluation consisted of a clinical interview and a mental status examination. (Tr. 1895.) In her mental status examination, Dr. Blazina noted that Western was dysphoric, intermittently tearful, and was "restless motorically throughout the evaluation" and appeared "quite anxious." (Tr. 1896.) She noted that he reported passive suicidal thoughts, that his attention and concentration skills were below average, and that he was easily distracted, particularly when tearful. (*Id.*) Dr. Blazina's diagnostic impression was "Depressive Disorder, NOS" and "Anxiety Disorder, NOS." (Tr. 1898.) She assessed Western as able to understand, remember, and follow simple instructions and also to understand and remember more complex, detailed instructions; however, she found that "during periods of extreme pain he may have difficulty following instructions due to pain issues." (Tr. 1899.) She opined that his abilities to sustain concentration and attention, interact socially, adapt to change in a work routine, and tolerate workplace stress are all "moderately impaired due to his depression and anxiety." (*Id.*)

On September 20, 2012, DDS nonexamining psychologist Frank Kupstas, Ph.D., reviewed June 2012 treatment notes from Dr. Hazlewood, Centerstone records from July and August 2012, and the July 2012 report of Dr. Blazina. Kupstas opined that Western was able to maintain concentration, persistence, and pace for "low-level detail tasks," could relate appropriately to supervisors and peers but might have occasional difficulty with the general public, and was able to adapt to routine changes in the workplace. (Tr. 1985.)

On January 2, 2013, Western and his wife met with Centerstone clinician John Ball, LCSW, for a "crisis session" during which Western admitted to "daily and intense homicidal thoughts toward former co-workers at Smith Co. EMS, arising from fear that those employees were wanting to be sexual with his wife. . . ." (Tr. 2009.) These thoughts had occurred "daily for past month," and Western was "drinking ETOH at a rate of a fifth per 3-4 days" to calm down. (*Id.*) Western stated that his medications were not working, although he was still taking them. (*Id.*) He had not previously disclosed this "anger issue" to Mr. Ball "due to shame." (*Id.*) Western admitted to "intense anger and habit of trying to suppress it for years." (*Id.*) Mr. Ball described Western's behavior at the beginning of the session and before he had calmed down as follows: "[Western] displayed agitated behavior in interview, insisting on standing at first, clenching back of the chair, pacing, face reddening, clenching and unclenching his fist . . . ." (*Id.*) Despite the fact that Western's insurance denied pre-approval for a psychiatric hospitalization, his wife "expressed desire to present for admission, that they could deal with the potential debt," and Western consented. (Tr. 2009, 2013.)

Western was admitted to Parthenon Pavilion psychiatric hospital on January 3, 2013, but checked himself out after a few hours. (Tr. 2015, 2018.) When he met with Dr. Hartman on January 4, 2013, he reported "ruminating thoughts but no homicidal or suicidal ideation, intention or plan.

(*Id.*) He told Dr. Hartman that the citalopram and buspirone were "not beneficial and he wants to consider other augmentation strategies." (*Id.*) Dr. Hartman discussed sobriety with Western "since current alcohol likely contributing to symptoms." (*Id.*) Dr. Hartman discontinued the buspirone, continued the citalopram and added Seroquel ER. (Tr. 2016.)

In a telephone call on January 10, 2013, Western told Mr. Ball that he "was obsessing about killing an identified victim . . . the director of EMS," that he "'believed he was appointed by god to deal vengeance to those who lie and deceive' and indicated that this identified victim was such a person." (Tr. 2022.) Western had "drunk a cup of Vodka" and could be heard arguing with his wife. (*Id.*) Mr. Ball called Mrs. Western, and she "stated the delusion was new to her, but he had been agitated today, was pacing now and continuing to drink. . . ." (*Id.*) Western was then taken to the Summit Medical Center ER and then transferred to the Madison Campus of Skyline Medical Center for inpatient psychiatric treatment. (Tr. 1991.)

On January 11, 2013, Western was psychiatrically evaluated at Skyline by Roy Asta, M.D. (Tr. 1994.) Western told Dr. Asta that he "has symptoms of depression, in which he is isolative, frustrated, has feelings of guilt and low energy." (*Id.*) He also admitted to "symptoms of mania, in which he has irritability, racing thoughts, and homicidal ideation," as well as "anxiety, in which he becomes very anxious when he is around foreign people or in large crowds. He describes racing heart, irritability, and trouble with concentration." (*Id.*) Western "denie[d] any symptoms of dependence towards alcohol or illicit substances." (*Id.*)

In his mental status exam findings, Dr. Asta wrote that Western was cooperative and friendly with regular and coherent speech, good eye contact, logical thought process, non-delusional thought content, alert and oriented. (Tr. 1995.) Western's affect was "anxious and depressed." (*Id.*) Dr. Asta diagnosed "major depressive disorder, recurrent, severe without

psychosis, rule out bipolar disorder, and alcohol abuse," noted a Global Assessment of Functioning (GAF) scale score of 35, admitted Western to the stress unit, placed him on suicidal precaution, and restarted his outpatient medications with a plan to adjust them as needed for mood stabilization and depressive symptoms. (*Id.*) During his four-day hospitalization from January 11, 2013, to January 14, 2013, Western was prescribed additional medications and the dosage of current medication was increased. (Tr. 1989–90.)

On February 4, 2013, J.W. McEwen, M.D. completed a "Certificate of Need for Emergency Involuntary Admission" regarding Western, opining that he posed an immediate and substantial likelihood of serious harm to himself and others. (Tr. 2181–82) Dr. McEwen noted that Western was depressed and using alcohol, and threatened suicide. (*Id.*) Western was then taken to Ten Broek Tennessee, a psychiatric treatment facility in Cookeville, where he was admitted. (Tr. 2183.)

At Ten Broek, Western underwent a psychiatric evaluation by Cynthia Rector, M.D. (Tr. 2188–92) Dr. Rector recorded the "chief complaint" as "psychosis, agitation, drinking." (Tr. 2188.) She recorded a history of:

> brief periods of racing thoughts & [decreased] sleep (2-3 days) for many years. Last fall, sought treatment at center stone [sic], & was placed on Celexa and Buspar. Patient reports that this [treatment] increased cycling/periods of hypomania & even began to have periods of paranoid thinking about former co-workers. . . . Patient continues to have cycles of mood, got intoxicated & had argument with wife. Broke a mirror [with] hand. . . .

(*Id.*)

Like Dr. McEwen, Dr. Rector completed emergency involuntary commitment papers, citing Western's suicidal statements, aggression and paranoia. (Tr. 2184, 2180.) Her diagnosis was "Bipolar II." (Tr. 2192.) Western was discharged from Ten Broek on February 8, 2013. (Tr. 2183.)

Dr. Rector continued as Western's treating psychiatrist in the outpatient setting. Regular treatment visits are documented in the record between March 2013 and July 2014. (Tr. 2734–37, 2749–52, 2757–62, 2767–74, 2787–89, 2819–36.) Dr. Rector also testified on Western's behalf at the ALJ hearing on April 7, 2014. (Tr. 633–42.) She testified that, when she first saw Western in the hospital on February 5, 2013, he was "hallucinating and . . . very paranoid." (Tr. 634.) From the history she obtained, "it seemed as though he was having a . . . first manic episode." (*Id.*) It was her impression that Western's alcohol consumption "was to kind of decrease his agitation that he was having." (*Id.*) She noted that he did not require detoxification or anything similar while he was in the hospital. (*Id.*)

Dr. Rector testified that, over the course of her treatment of Western, his mood was variable and that they "had a lot of trouble getting his mood stable. And he's had some depression episodes and he's had two or three manic episodes. . . . [W]e've had a lot of trouble finding a mood stabilizer that works." (Tr. 635.) She noted that Western "has a tendency to have mixed episodes, which means he had depressive symptoms and manic symptoms at the same time and that's much harder to treat." (*Id.*) She also noted that Western had "had a lot of problems with insomnia," which is "a symptom of the mania in a mixed episode." (*Id.*) In addition, Western's other problems, including his back pain, made it difficult for him to sleep at night. (*Id.*) Dr. Rector noted that insomnia "increases your risk of having further manic episodes and having more trouble with your moods and keeping them stable." (Tr. 635–36.) She "had to make several, several medication changes and, and medication adjustments trying to get . . . him evened out. It's been really difficult to do that." (Tr. 636.) When questioned about Western's alcohol use, Dr. Rector testified that he had not been a consistent alcohol user, he had used alcohol to "self medicate" the symptoms of his bipolar disorder, and he had not become addicted to alcohol. (Tr. 634–38.) She testified that his "last

reported use of alcohol" was "October, November of last year." (Tr. 637.) When it was noted to her that the last entry in her records regarding drinking was in September 2013, she replied, "That's about the right time." (*Id.*)

In August 2013 and April 2014, Dr. Rector completed assessments of Western's work-related mental limitations. (Tr. 2753–56, 2783–86.) Consistent with her hearing testimony, Dr. Rector opined in these assessments that Western's bipolar symptoms, in particular his manic episodes, would result in limitations that would preclude regular and continuing work activity. (*Id.*)

On January 23, 2013, Western was admitted to University Medical Center (UMC) in Lebanon, Tennessee for "[b]ack pain radiating to the chest along with some nausea and shortness of breath, starting yesterday." (Tr. 2689.) Admitting physician Bernard Sy, M.D.'s diagnosed a heart attack. (Tr. 2687.) Western was transferred from UMC to St. Thomas Hospital on January 24, 2013. (Tr. 2339.) Western was kept at St. Thomas Hospital from January 24 to January 29, 2013. (Tr. 2731–32.) On January 24, 2013, Dr. Mark Goldfarb attempted angioplasty to open the 100% occluded left anterior descending (LAD) coronary artery, but was unsuccessful. (Tr. 2344–45.) On January 28, 2013, Arthur Constantine, M.D. also attempted treatment of the LAD coronary artery, but also was unsuccessful. (Tr. 2342–43.) Dr. Constantine's post-catheterization assessment was "1. Unsuccessful and complicated attempted PTCA stem of the proximal LAD occlusion (unable to cross with multiple wires). 2. Two-vessel CAD with occluded LAD and occluded RCA with no significant disease in the circumflex, obtuse marginal branch, and first diagonal branch territories." (*Id.*) The LAD coronary artery continued to be 100% occluded. (*Id.*) At the time of his discharge on January 29, 2013, Western "was feeling well without angina on medical therapy." (Tr. 2739.) Dr. Constantine noted that, "with Mr. Western's young age, if we

could delay bypass to a later time if appropriate, this perhaps would be most beneficial to his long-term care. Obviously, if his symptoms do not allow us this luxury, we will need to proceed with surgery sooner. . . ." (*Id.*)

At his February 25, 2013, post-hospitalization follow-up visit with Dr. Constantine, Western reported "exertional upper back discomfort," "no interruption in his activities as long as he controls the speed of the activities," and that he did "get dyspneic if he pushes himself." (Tr. 2728.) Dr. Constantine noted that he was "[h]esitant to get more aggressive [in treating Western's heart disease] in a setting of 'incomplete revascularization.'" (Tr. 2729.) He ordered a cardiac MRI, which revealed that "[t]he left ventricle is mildly dilated with moderately decreased systolic contractile function;" the left ventricle ejection fraction was 37%; and aortic, mitral, and tricuspid valve function were all normal. (Tr. 2726–27.) However, it was noted that Western "refused administration of intravenous adenosine or intravenous gadolinium contrast," so that "stress perfusion imaging and delayed contrast hyperenhancement imaging were not performed on the current study." (Tr. 2727.) On or about September 4, 2013 Dr. Constantine, submitted responses to a "Treating Cardiologist Questionnaire," opining that Western's ischemic coronary artery disease is established by angiography showing 100% occlusion of two nonbypassed arteries and that the unsuccessful attempts to remedy these defects made it possible that he would experience markedly limiting symptoms with ordinary physical activity. (Tr. 2764–65.)

**B.    ALJ Hearing Testimony**

Western testified before the ALJ that he attempted a work hardening program that mimicked the exertion required in his paramedic job, but that he could not lift fifty pounds without significant back and leg pain and failed the program. (Tr. 669–70.) He testified that, "[b]asically the more that I do, as far as physical activity, the more pain that I have. If I don't do anything then

I have very little pain, if any. But if I try to get up and try to clean the house more than I should or . . . do more than what I should, I have a lot" of pain. (Tr. 671.) He stated that he spends most of the day sitting in a recliner with his legs elevated, which relieves his back pain. (*Id.*) He will also lie down on the couch for a couple of hours, two or three times a week. (*Id.*) He testified that sometimes he will spend two or three hours (with or without breaks) cleaning, which causes significant back pain the next day and residual pain for two to three days afterward. (Tr. 672, 677.) He has had his back pain flare up to such an extent that he has considered requesting a lumbar fusion. (Tr. 674.)

Western testified that his pain medications had previously included a type of morphine, as well as Hydrocodone 10 as needed for breakthrough pain and Neurontin for the pain in his legs. (Tr. 674–75.) He was eventually weaned off of the narcotics in June 2012, but continued to take Neurontin three times a day and a muscle relaxer in the morning. (Tr. 675.) After the withdrawal of narcotic medications, his symptoms "got kind of severe for a while but they sort of backed back down." (*Id.*) He still has flare ups of pain, but now has "nothing to fall back on as far as something that controls flare ups other than just trying to rest and wait it out." (*Id.*) Western testified that he has back pain flare ups "usually about two or three times a month," typically when he goes shopping with his wife or does any type of vacuuming or sweeping. (Tr. 676.)

Western testified that he had sometimes taken his narcotic medications to combat symptoms of anxiety and that, when he was weaned from narcotics, his anxiety became more prominent. (Tr. 678.) As a result, he turned to alcohol (Tr. 679) and he began drinking every day, "at least a quarter of a fifth of vodka a day." (Tr. 684.) When he began seeing Dr. Rector for psychiatric treatment, she prescribed Trileptal and Seroquel which kept him calm and "somewhat relaxed." (Tr. 679–80.) At its worst, his mental illness produced suicidal and homicidal thoughts,

as well as auditory and visual hallucinations. (Tr. 680.) He testified that, since being diagnosed with bipolar disorder and receiving treatment from Dr. Rector, his mood was stable most of the time, although he had "setbacks" once or twice a month, lasting "[u]sually a day or two," where he would isolate and have periods of rage. (Tr. 681.) He also has periods when he feels he "can go and do anything and that's usually when I'll end up . . . overdoing it and having a flare up in my lower back because I feel like I have so much energy." (Tr. 681–82.) During these manic periods, he does not sleep much. (Tr. 682.) He was taken off of Seroquel and now takes Risperidone and Trileptal at night, which makes him groggy in the morning. (*Id.*) On a typical day, he spends at least seven hours either in his recliner or on his couch. (Tr. 683.) He testified that his daughter and his wife bring him enjoyment at times, but otherwise he has no enjoyment in life. (*Id.*) At the time of the hearing, Western had not had any alcohol in three weeks, stating that his wife had a zero-tolerance policy for drinking. (Tr. 685.)

Western testified that he was unable to work "[m]ainly because of the back pain," but also because of his lack of motivation due to depression. (Tr. 686.) He further stated that, since his heart attack, any physical exertion brings on chest pain, pain through his shoulder blade, and shortness of breath. (Tr. 686–87.) Western weighed about 310 pounds at the time of the hearing, and had tried to lose weight, but was prone to relapsing into poor eating habits after a month or two of eating well. (Tr. 687.) He did not feel that he deserved his wife and daughter because he had hurt them too much, but was thankful for them. (Tr. 688.) Since being diagnosed with bipolar disorder, he had taken his medications as prescribed, except for one occasion when he decided he did not need them and became violent, leading to his second psychiatric hospitalization in 2013. (Tr. 688–89.)

Western's wife, Misty Western, testified that Western's days were often spent sitting around the house from the time he took their daughter to school in the morning to the time to pick her up. (Tr. 691.) There were days when he was far more physically active, doing housework and cooking dinner, but then he would spend the next day or two sitting in a reclined position. (*Id.*) She testified that, when Western got out of the psychiatric hospital in February 2013, he went to live with his parents for February and March and did not have anything to drink until July 15, 2013. (Tr. 694.) At that point, Mrs. Western demanded that he had to change, so he left the home and went back to live with his parents. (*Id.*) He stayed with his parents for two weeks before returning to the home and had not had anything to drink since that time. (*Id.*) She testified that Western had no energy and was not motivated to help around the house and that, since his heart attack, he would get short of breath with any exertion. (Tr. 694–95.) She stated that the medications he takes for his bipolar disorder have improved his mood, but not his energy level. (Tr. 695–96.)

A vocational expert also testified at the hearing (Tr. 696–716), but the ALJ sent follow up interrogatories to a different vocational expert (Tr. 1129–35), who appeared at a supplemental hearing and provided the testimony that the ALJ relied on in her decision. (Tr. 616–17, 643–58.) In response to the ALJ's hypothetical question incorporating Western's vocational factors and residual functional capacity (RFC) (Tr. 1131), the vocational expert identified jobs that a comparable individual would be able to perform in three representative occupations: assembler (98,000 jobs existing nationally), grader/sorter (31,000 jobs existing nationally), and inspector (48,000 jobs existing nationally). (Tr. 617, 1132.)

### III.     Analysis

#### A.      Legal Standard

Judicial review of "any final decision of the Commissioner of Social Security made after a hearing" is authorized by the Social Security Act, which empowers the district court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This Court reviews the final decision of the Commissioner to determine whether substantial evidence supports the agency's findings and whether the correct legal standards were applied. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). "Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). The Court also reviews the decision for procedural fairness. "The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Id*. at 723.  Failure to follow agency rules and regulations, therefore, "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id*. (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).

The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). This Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v.*

*McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). "However, a substantiality of evidence evaluation does not permit a selective reading of the record . . . [but] 'must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

**B. The Five-Step Inquiry**

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The ALJ considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1.  A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2.  A claimant who does not have a severe impairment will not be found to be disabled.

3.  A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4.  A claimant who can perform work that he has done in the past will not be found to be disabled.

5.  If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Miller*, 811 F.3d at 835 n.6; 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations his impairments cause and the fact that he cannot perform past relevant work; however, at step five, the burden shifts to the agency to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

When determining a claimant's RFC at steps four and five, the agency must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Western's Statement of Errors

#### 1. Listing 4.04(C) (Myocardial Ischemia with Coronary Artery Disease)

Western raises twelve arguments for reversal of the ALJ's decision, several of which are simply not sufficiently developed to inform the Court's review.[4] Most of his arguments are based on alleged error at the fourth and fifth steps of the sequential evaluation. However, Western makes one non-conclusory argument for disability at the third step under the Listings, in which he claims that the ALJ failed to evaluate whether his conditions equal those of Listing 4.04(C) based on

---

[4] For example, Western argues, without more, that "the great weight of evidence supports a far more restrictive RFC finding than the one set forth in the ALJ's decision. The ALJ's RFC finding is not supported by substantial evidence." (Doc. No. 21, PageID# 3048.) He also argues that "Dr. Rector's opinions establish that [his] mental conditions meet or equal at least one of the Listings for mental disorders. The ALJ's failure to so find is not supported by substantial evidence." (*Id.* at PageID# 3045.)   These and other perfunctory arguments asserted in Western's brief are deemed waived. *See Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 543 (6th Cir. 2014).

coronary artery disease that has not been quantified by exercise testing. (Doc. No. 21, PageID# 3044.)

The criteria of Listing 4.04(C) are as follows:

4.04   Ischemic heart disease, with symptoms due to myocardial ischemia, as described in 4.00E3–4.00E7, while on a regimen of prescribed treatment (see 4.00B3 if there is no regimen of prescribed treatment), with[:]

C.     Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC [(medical consultant)], preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:

1.   Angiographic evidence showing:

a.      50 percent or more narrowing of a nonbypassed left main coronary artery; or,

b.      70 percent or more narrowing of another nonbypassed coronary artery; or,

c.      50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or,

d.      50 percent or more narrowing of at least two nonbypassed coronary arteries; or,

e.      70 percent or more narrowing of a bypass graft vessel; and,

2. Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

20 C.F.R. pt. 404, subpt. P, app. 1, § 4.04(C).

Based on the opinion of his treating cardiologist Dr. Constantine (Tr. 2763–65), Western argues that his coronary artery disease is equal to the Listing because it satisfies all listed criteria except the requirement that, in the absence of timely exercise test results or "a timely normal drug-induced stress test," he must be considered "at risk" for exercise testing. 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 4.04(C), 4.00(E)(9)(g) ("We will use 4.04C only when you have symptoms due to

myocardial ischemia . . . while on a regimen of prescribed treatment, you are at risk for exercise testing . . ., and we do not have a timely ETT or a timely normal drug-induced stress test for you."). Dr. Constantine opined that the angiographic evidence exceeded the requirements of the Listing and that Western could suffer marked limitation of physical activity because attempts to stent his occluded arteries had been unsuccessful. (Tr. 2764.) He further opined unequivocally that Western was not at risk for exercise testing despite having two arteries that are 100% occluded. (Tr. 2765.) This undated opinion was faxed to Western's counsel on September 4, 2013 (Tr. 2763), and so apparently was rendered after Western declined a chemical stress test in March 2013 (Tr. 1114, 2726–27, 2880), but just before the stress perfusion cardiac MRI performed on September 16, 2013. (Tr. 2776–77, 2780.) That successful drug-induced stress test[5] confirmed ischemia in Western's left anterior descending (LAD) artery and possibly his right coronary artery (RCA), but the "[r]emainder of [the] myocardium including basal and mid LAD distributions as well as mid

---

[5]    Drug-induced stress tests are discussed in § 4.00(C)(14), as follows:

These tests are designed primarily to provide evidence about myocardial ischemia or prior myocardial infarction, but do not require you to exercise. These tests are used when you cannot exercise or cannot exercise enough to achieve the desired cardiac stress. Drug-induced stress tests can also provide evidence about heart chamber dimensions and function; however, these tests do not provide information about your aerobic capacity and cannot be used to help us assess your ability to function. Some of these tests use agents, such as Persantine or adenosine, that dilate the coronary arteries and are used in combination with nuclear agents, such as thallium or technetium (for example, Cardiolyte or Myoview), and a myocardial scan. Other tests use agents, such as dobutamine, that stimulate the heart to contract more forcefully and faster to simulate exercise and are used in combination with a 2–dimensional echocardiogram. We may, when appropriate, purchase a drug-induced stress test to confirm the presence of myocardial ischemia after a review of the evidence in your file by an MC, preferably one with experience in the care of patients with cardiovascular disease.

20 C.F.R. pt. 404, subpt. P, app. 1, § 4.00(C)(14).

and distal RCA appear[ed] completely viable" and the aortic, mitral, and tricuspid valve function were shown to be normal. (*Id.*)

The prefatory language to the cardiovascular listings recognizes the exercise tolerance test requirement of Listing 4.04(A) and states that the agency "will consider whether to purchase an exercise test when . . . [t]here is a question whether your cardiovascular impairment meets or medically equals the severity of one of the listings, or there is no timely test in the evidence we have. . . ." 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.00(C)(3)(b), (6)(a)(i). The agency further states that it will not purchase an exercise test when it can make a determination under the Listing based on the evidence already present in the record, *id.* at § 4.00(C)(6)(b), but clarifies that, "[i]f you are under the care of a treating source . . . for a cardiovascular impairment, this source has not performed an exercise test, and there are no reported significant risks to testing, we will request a statement from that source explaining why it was not done or should not be done before we decide whether we will purchase the test." *Id.* at 4.00(C)(7)(b). It appears that none of these steps was taken by the ALJ.

Here, despite counsel's argument in a post-hearing brief (Tr. 1110–15) and at the close of the supplemental hearing (Tr. 659) that Western met or equaled Listing 4.04(C), and despite finding Western's severe impairments to include "coronary artery disease status post unsuccessful attempt to open chronically occluded LAD and RCA" (Tr. 606–07), the ALJ's step-three analysis only explicitly considered the listings for disorders of the spine and for mental impairments without any mention of Listing 4.04(C) or the cardiovascular listings generally. (Tr. 609–10.) It was only in determining Western's RFC that the ALJ examined Dr. Constantine's opinion, as follows:

> Dr. Constantine does not state that the claimant has marked physical limitations just
> that it was possible. Furthermore, in treatment notes from February of 2013, Dr.

> Constantine discussed with claimant the importance of getting 30 minutes of aerobic exercise on a daily basis and other lifestyle changes in the treatment of his coronary artery disease. . . . Therefore, the undersigned finds that Dr. Constantine does not actually state that the claimant has any limitations. Therefore, the undersigned gives this questionnaire great weight.

(Tr. 615.) The ALJ further noted that, "in June of 2013, during an office visit with Dr. Hazelwood, the claimant reported he was feeling better cardiac wise and that he was staying as active as he could." (Tr. 612.) But that treatment note from Dr. Hazelwood described Western's cardiac improvement in relative terms: "He reports he . . . had a myocardial infarction in January. He states he is feeling better cardiac wise. He is not working, but stays . . . active as much as he can. He denies any chest pain, shortness of breath and sedation." (Tr. 2747.) The statement that, by June 2013, Western was "feeling better cardiac wise" than he was at the time of his heart attack is unremarkable.

At the August 15, 2013 hearing, Western testified that physical exertion such as carrying groceries into the house for two or three trips or walking up and down steps would bring on "the chest pain that I was having [at the time of his heart attack], the pain through my shoulder blade[s], shortness of breath." (Tr. 686–87.) This correlation of such symptoms with physical exertion is mirrored in Dr. Constantine's acknowledgment that the symptoms were possible with ordinary physical activity due to the unresolved occlusion of two arteries. (Tr. 2764.) The ALJ's conclusion that Dr. Constantine's opinion should somehow be construed as stating that Western has no limitations related to his cardiac impairment is untenable. The Government argues that the Court may look to the ALJ's explanations in other parts of her decision to find support for her determination that no listing was met. (Doc. No. 22, PageID# 3061) (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). However, the Court does not find substantial support

anywhere in the ALJ's decision for the conclusion that Western's ischemic coronary artery disease is not a listing-level impairment.

Rather, the Court finds that the record in this case and the language of the Listings required the ALJ to examine Western's condition vis-à-vis Listing 4.04(C). "In essence, an ALJ must evaluate whether a claimant meets or equals a particular listed impairment when the ALJ is fairly on notice that the claimant could meet or equal that impairment." *Scott v. Comm'r of Soc. Sec.*, No. 16-11922, 2017 WL 2837150, at *9 (E.D. Mich. May 23, 2017) (citing cases); *see also Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013) ("If . . . the record 'raise[s] a substantial question as to whether [the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing.") (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)). Counsel's post-hearing brief clearly put the ALJ on notice of his argument that Western equaled the criteria of Listing 4.04(C), as did the fact that Dr. Constantine's opinion was sought to speak to its criteria. As discussed above, the extent of Western's ischemic coronary artery disease (completely occluding two arteries where efforts to insert stents have failed), its confirmation as a result of a drug-induced stress test administered after the date of Dr. Constantine's opinion, and the language of the listings regarding exercise testing and the agency's duties in procuring such tests when timely results are not included in the record, compel the conclusion that the ALJ's failure to explicitly consider Listing 4.04(C) was not harmless error. Remand for that consideration is required.

## 2. Weighing of Treating Psychiatrist's Opinion

Western argues that the ALJ further erred in rejecting the opinion and testimony of Western's treating psychiatrist, Dr. Rector, whose opinion should have been given controlling weight. The "treating physician rule" requires the ALJ to give controlling weight to a treating

physician's opinion about the nature and severity of the claimant's condition as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see*, *e.g.*, *Gentry*, 741 F.3d at 723. "Unless [the ALJ] give[s] a treating source's medical opinion controlling weight," the opinion must be weighed based on factors such as the length, frequency, nature and extent of the treating relationship, the supportability of the opinion, the opinion's consistency with the medical record as a whole, and the specialization of the treating source. 20 C.F.R. § 404.1527(c); *Gentry*, 741 F.3d at 723 (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007)). The ALJ must always give good reasons for discounting the weight given to a treating source opinion that are "supported by the evidence in the case record, and [are] sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2); SSR 96–2p, 1996 WL 374188, at *5 (July 2, 1996)). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004)).

Dr. Rector rendered two opinions "considering . . . the nature and severity of Mr. Western's mental conditions as they exist when he is not abusing alcohol," in August 2013 and in April 2014. (Tr. 2753–56, 2783–86.) The Government admits that these opinions, if adopted, would establish the disabling severity of Western's symptoms. (Doc. No. 22, PageID# 3055.) The ALJ accepted, and the Government does not contest, that Dr. Rector gave the proper clinical diagnosis of bipolar disorder. She made this diagnosis upon examining Western for the first time when he was involuntarily admitted to Ten Broek Tennessee on February 5, 2013, after suffering what Dr.

Rector described as his first manic episode. (Tr. 634, 2184, 2188–92.) In her psychiatric evaluation of Western after his emergency admission, Dr. Rector noted that he reported a history of brief periods of racing thoughts and decreased sleep which prompted him to seek mental health treatment at Centerstone Community Mental Health Center, but that the medications he was prescribed had increased his mood cycling and periods of hypomania. (Tr. 2188.) At the time of his admission to Ten Broek, Western continued to have these cycles of mood and had experienced hallucinations. (Tr. 634, 2188.) Dr. Rector testified that Western's records revealed that "[h]e had been diagnosed primarily in the past with depression" and that "he was having a lot of difficulty . . . accepting that [bipolar] diagnosis for a while." (Tr. 634.) Dr. Rector's treatment of Western continued in the outpatient setting, from which she reported the following observations during her hearing testimony:

> His mood varies. He's had a lot of – we've had a lot of trouble getting his mood stable. And he's had some depression episodes and he's had two or three manic episodes, not as severe as the one he had in the hospital. He hasn't had any more hallucinations. But he's had a lot of trouble – we've had a lot of trouble finding a mood stabilizer that works. Some patients [get] on one and it works right away and they kind of stabilize out and become pretty even. Garry's had a lot more trouble getting medication in a combination that works. He also has a tendency to have mixed episodes, which means he had depressive symptoms and manic symptoms at the same time and that's much harder to treat.

(Tr. 635.) Dr. Rector further testified that Western had a lot of problems with insomnia, "a symptom of the mania in a mixed episode . . . that also increases your risk of having further manic episodes and having more trouble with your moods and keeping them stable." (Tr. 635–36.) She testified that Western had not been "a consistent alcohol consumer," but drank episodically "in the context of him having a mixed episode and having a lot of insomnia and having a lot of trouble with his mood and being irritable, which are all symptoms of the bipolar disorder." (Tr. 636.) Dr. Rector concluded that Western used alcohol to self-medicate but was not an alcoholic. (*Id.*)

Dr. Rector further testified that Western fell into the category of bipolar patients who "have forms [of the disorder] that are kind of milder early on and then because of stressors" or traumatic events in their life, produce a manic episode. (Tr. 639–40.) She explained that such patients may have had repeated depressive episodes before their initial episode of mania, "[a]nd once the mania appears, kind of midlife, then it becomes a totally different illness and it's a lot harder to treat," especially if the patient has mixed episodes of mania and depression. (Tr. 640.) She testified that Western had "only had a couple of periods of time lasting maybe at the maximum eight to ten weeks where his moods have been really stable" and that, otherwise, "[h]e's really cycled a lot." (*Id.*) Dr. Rector opined that this cycling of moods, combined with insomnia, would make it very difficult for Western to be consistent at a job. (Tr. 640–41.) Her assessments of work-related functional limitations due to Western's "Bipolar Disorder I, current episode mixed, moderate" echo her testimony. These assessments reflect that Western's mood lability limits his ability to consistently perform work activities, and that such ability is particularly limited when he is manic. (Tr. 2753–56, 2783–86.)

The ALJ did not find that the opinions expressed in Dr. Rector's assessments and testimony were not entitled to controlling weight because they were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or were "inconsistent with the other substantial evidence in [the] case record." Nor did she mention the controlling-weight standard, except by reference to her consideration of "opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSR[] 96-2p. . . ."[6] (Tr. 610.) Rather, the ALJ accepted the clinical

---

[6]     SSR 96-2p, entitled "Titles II & XVI: Giving Controlling Weight to Treating Source Medical Opinions" provides as follows:

> Whether a medical opinion is "not inconsistent" with the other substantial evidence is a judgment that adjudicators must make in each case. Sometimes, there will be

diagnosis of bipolar disorder but gave "little weight to Dr. Rector's opinion and testimony because [they are] inconsistent with her own treatment notes and with the treatment notes from other mental health providers." (Tr. 614.)

The Sixth Circuit has noted that factors such as an opinion's inconsistency with underlying treatment notes are "properly applied only *after* the ALJ has determined that a treating-source opinion will not be given controlling weight." *Gayheart*, 710 F.3d at 376 (emphasis added) (citing 20 C.F.R. § 404.1527(c)(2)). Consistency with other substantial medical evidence is a central focus of the controlling-weight inquiry. Outside of Dr. Rector's treatment notes, the only evidence cited by the ALJ as inconsistent with Dr. Rector's opinions is (1) the evidence from Western's psychiatric hospital admissions which showed that he had been drinking, and (2) the evidence that in May 2013 Western "reported he had not been taking his Trileptal for quite some time." (Tr. 614.) To the extent that the ALJ inferred an inconsistency between evidence of Western's drinking at or around the time of his hospital admissions and Dr. Rector's opinion "that his mental health

---

an obvious inconsistency between the opinion and the other substantial evidence; for example, when a treating source's report contains an opinion that the individual is significantly limited in the ability to do work-related activities, but the opinion is inconsistent with the statements of the individual's spouse about the individual's actual activities, or when two medical sources provide inconsistent medical opinions about the same issue. At other times, the inconsistency will be less obvious and require knowledge about, or insight into, what the evidence means. . . . Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p, 1996 WL 374188, at *3–4 (July 2, 1996).

problems were caused by his bipolar disorder and not by his alcohol use" (*id.*), such an inference is unwarranted. In her hearing testimony, Dr. Rector explained her opinion regarding Western's alcohol use as a response to the onset of his mixed episodes, rather than an event precipitating those episodes. (Tr. 636.) The fact that alcohol use and bipolar symptoms co-occurred cannot reasonably by construed as contradicting Dr. Rector's opinion that disabling work-related limitations resulted from those symptoms alone.[7] Further, the one instance of medication noncompliance cited by the ALJ, when Western stopped taking Trileptal "because it made him 'tired in the morning'" (Tr. 2758), does not constitute substantial evidence that is inconsistent with Dr. Rector's opinion.

The only other mental health treatment providers identified in the ALJ's decision are the staff at Centerstone, who treated Western from July 5, 2012, through January 15, 2013, for symptoms of depression and panic disorder. The record shows that, after a period of good control of his depressive symptoms in late 2012 (Tr. 2002–08), Western was described as suffering "intense anger" (Tr. 2009) and an "acute exacerbation of mood [symptoms]," including homicidal ideation in early January 2013, resulting in an aborted attempt at voluntary inpatient treatment (Tr. 2015) followed by his involuntary admission to Ten Broek where Dr. Rector began treating him. Thus, the Centerstone treatment notes which the ALJ refers to as inconsistent with Dr. Rector's opinions do not address Western's conditions and limitations after January 2013, when he

---

[7]     It bears noting that the ALJ also found "alcohol dependence in reported remission" to be a severe impairment. (Tr. 606.) It appears that the ALJ viewed Western's alcohol dependence as a causal factor in the onset of his bipolar symptoms without which such symptoms would not occur, or would not occur at a level of severity requiring emergency medical attention, given that the only work-related limitation of mental function included in the RFC finding is an inability to understand, remember, and carry out complex instructions. (Tr. 610.) Under these circumstances, Western's alcohol dependence should have been evaluated as a possible contributing factor material to the disability determination under 20 C.F.R. § 404.1535. *See Williams v. Barnhart*, 338 F. Supp. 2d 849, 862–65 (M.D. Tenn. 2004).

experienced psychotic symptoms and his first manic episode, leading to Dr. Rector's February 2013 diagnosis of bipolar disorder.

Neither the consultative psychological examiner Dr. Blazina (who examined Western in July 2012 and whose opinion was given "little weight" by the ALJ (Tr. 614, 1895–99)) nor the nonexamining DDS consultant Dr. Kupstas (who considered Western's medical records in September 2012 and whose opinion was given "great weight" by the ALJ (Tr. 615)) opined as to limitations stemming from the manic periods and mood lability associated with Western's bipolar disorder. It thus appears that Dr. Rector's opinion as to Western's limitations from bipolar disorder beginning in February 2013 is not opposed in the medical opinion evidence. Despite this state of the evidence, and despite recognizing bipolar disorder as a severe impairment along with depression and anxiety (Tr. 606), the ALJ ultimately determined that Western was almost entirely unrestricted in his mental ability to work. (Tr. 610.) This determination lacks the support of substantial evidence.

The Court finds reversible error in the ALJ's weighing of the opinions of Dr. Rector, a treating and testifying specialist who has been Western's only mental health treatment provider since his bipolar diagnosis. The ALJ's failure to first determine whether Dr. Rector's opinions were due controlling weight, and then to give good reasons in support of her finding that such opinions were due "little weight," was error. Even if the record supported an implicit finding that Dr. Rector's opinions were not due controlling weight, the ALJ's citation to Dr. Rector's treatment notes which show Western's periodic reports of improvement with medication (Tr. 614) cannot be deemed "good reason" for giving the opinions such negligible weight. In fact, the ALJ significantly misrepresents what Dr. Rector's treatment notes reveal about Western's symptoms in April 2014, when she states that "[i]n April of 2014, the claimant reported that his symptoms had decreased.

Treatment notes stated that the claimant was oriented, that he was able to concentrate despite distractions in the room, and that he had good judgment and insight." (Tr. 614.) Western was treated twice by Dr. Rector in April 2014. At the second of those visits, he reported "depressed mood a majority of the time" but "not really . . . any symptoms of mania." (Tr. 2822.) At the first April visit, however, Dr. Rector recorded the following history reported by Western:

> He reports that he has moved out of his house and lives with his parents because of conflict with his wife. He reports more depression symptoms and thought about suicide with a plan. His plan would be to "take a bunch a pills." He states that the thoughts scared him and he decided to move in with his parents who are home during the day. He feels hopeless, suicidal, and depressed. He reports nightmares about work. He reports a decrease in symptoms since moving in with his parents. He reports racing thoughts and insomnia, labile affect and mood variability from anger outbursts to tearfulness. He denies psychosis. He believes that previous sedation has been more related to Trileptal than to Risperdal and agrees to a different mood stabilizer. He states that during this episode that he has not been drinking. His disability hearing is coming up soon and he is anxious about it.

(Tr. 2787.) After reciting this history, Dr. Rector noted on mental status exam that Western "was oriented, that he was able to concentrate despite distractions in the room, and that he had good judgment and insight," as reported by the ALJ. (Tr. 614.) However, these exam results also included descriptions of his mood as "depressed and worried" with a congruent affect. (Tr. 2788.) Dr. Rector ended the treatment note with an assessment of "increase in symptoms of his bipolar disorder" and orders to "increase Risperdal to 4mg and add Lamictal 25mg x 2 weeks, then 50mg qd. Stop Trileptal." (Tr. 2788–89.) The full import of this treatment note is thus substantially different than it appears from the ALJ's report of benign findings picked from among the exam results.

* * *

These errors in consideration of a treating psychiatrist's opinions, combined with the ALJ's failure to consider the applicability of Listing 4.04(C), require reversal of the administrative

decision. In light of this conclusion, the Court need not consider Western's other less-developed arguments for reversal of the ALJ's decision or his arguments that the ALJ's termination of his counsel's cross-examination of the vocational expert violated his due process rights and the vocational expert's testimony to the existence of available jobs was unreliable. (Tr. 646–55, 1057–1109, 1202–04, 1206–18, 1750–69, 1770–71.)[8] Those arguments are rendered moot by the reconsideration of Western's medical history and limitations; if a third vocational expert's testimony is required on remand, they can be raised again. *But cf. Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (listing "the reliability of the vocational expert's testimony" as but one factor the ALJ should consider in determining whether the jobs identified exist in significant numbers,

---

[8]        In short, these arguments are based on the vocational expert's methodology for determining the figures reported in her testimony in response to the ALJ's hypothetical questions. The expert agreed that her ultimate source of job information relies on the Bureau of Labor Statistics' biannual Occupational Employment Survey (OES) results. Those results inform the categorization of occupations into roughly 820 broad groupings that are assigned standard occupational code (SOC) numbers. The expert testified that, when a hypothetical question is posed, she compares the hypothetical restrictions to exemplar job codes from the Dictionary of Occupational Titles (DOT) which fall within the applicable SOC category, and then produces numbers of such jobs in the economy by using "a formula applied based on [her] own experience as well as what other vocational experts have found as well as how the occupations are classified." (Tr. 647.) Western's counsel argued that it is "simply impossible" to begin with the OES results, from which occupations are put into broad categories without being differentiated in terms of exertional requirements or even full-time versus part-time, and reliably work your way down to a specific number of jobs within such broad categories that correspond to a particular DOT code, and that are performed at a given level of exertion and accommodate other specified work restrictions. (Tr. 650–53.) The ALJ ruled that the expert was qualified, that her testimony "complied with Agency policy," and that "she provided a reasonable explanation regarding her methodology." (Tr. 617.) The ALJ further expressed at the supplemental hearing that, even if counsel's argument were accepted as correct in principle, it would not change the outcome in this particular case where the expert had experience placing an individual in one of the identified jobs (potato chip sorter) which "was performed at the light, unskilled level with a sit/stand option," and where it could be presumed from the RFC finding that a significant number of available jobs would likely remain even if the expert were "almost completely wrong" as to the number of jobs identified within the example occupations. (Tr. 651.)

and concluding that "[t]he decision should ultimately be left to the trial judge's common sense" in light of the "particular claimant's factual situation").

This case has already faced one remand, and the undersigned is loath to extend the period of Western's uncertainty by requiring additional administrative proceedings. However, the Court must remand this action again unless "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). In other words, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Id.* Despite compelling proof of the limiting effects of Western's physical and mental impairments, the undersigned finds remand necessary for the ALJ to consider the identified bases for reversal in the first instance.

## IV.    Conclusion

For these reasons, the undersigned RECOMMENDS that Western's motion for judgment on the administrative record (Doc. No. 20) be GRANTED, the decision of the ALJ be REVERSED, and the case be REMANDED for further administrative proceedings consistent with this opinion.

ENTERED this 20th day of February, 2018.

Alistair E. Newbern
U.S. Magistrate Judge